USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/5/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE NEW YORK TIMES COMPANY and
JEREMY MERRILL,

                            *Plaintiffs*,

                       v.

UNITED STATES SECRET SERVICE,

                           *Defendant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

17 Civ. 1885 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

The New York Times and Jeremy Merrill ("NYT") filed four Freedom of Information Act ("FOIA") requests, seeking billing and payment information from the United States Secret Service (the "Service") regarding the air transportation cost of the Service's protective details which accompanied the two 2016 Presidential candidates during the recent campaign. The Service conducted a search of its relevant files and provided documents showing the total costs per trip for the air transportation of the Service's agents in the 2016 campaign. The Service redacted portions of the documents which disclosed the total passengers, the total Secret Service passengers, the total cost of each leg and the cost per passenger on each of the campaign flights.

The Service claims the redacted information is exempt from disclosure under FOIA Exemptions. NYT seeks judicial review of the Service's claim. There is no suggestion that the Service withheld information to cover up any misfeasance or mistakes. The NYT's FOIA requests for information are entirely appropriate; and there is no suggestion of bad faith by the Service in granting the FOIA requests in part and objecting to the balance.

The Service moves for summary judgment, and NYT cross-moves for summary judgment. NYT also seeks reasonable attorneys' fees and costs under 5 U.S.C. § 552(a)(4)(E). For the

reasons set forth below, the Service's motion for summary judgment is **GRANTED**; the NYT's

cross-motion for summary judgment is **DENIED;** and the NYT's request for attorneys' fees and

costs is **DENIED**.

## BACKGROUND

NYT filed the following four FOIA requests to the Service:

(1) Any and all documents, including invoices or bills, related to payments for or costs of air transportation of U.S. Secret Service personnel on aircraft owned or operated by TAG Air (the "First Request" filed on May 12, 2016);

(2) Any and all documents, including invoices or bills, related to payments for or costs of air transportation of U.S. Secret Service personnel who were engaged in activities related to the presidential campaign of Donald J. Trump (the "Second Request" filed on May 12, 2016);

(3) Donald J. Trump Charter Air Billing invoices, and their corresponding proof of payment, for any flight dates between May 30, 2016 and January 20, 2017 (the "Third Request" filed on January 30, 2017); and

(4) Hillary Clinton Charter Air Billing invoices, and their corresponding proof of payment, for any flight dates after 2014 (the "Fourth Request" filed on February 14, 2017).

ECF 17 (Declaration of Kim E. Campbell ("Campbell Decl.")) ¶¶ 5–8; Exs. A–D.

On October 17, 2016, the Service responded to the NYT that it had conducted a reasonable

search for documents responsive to the First Request, but had found no records pertaining to the

request. There are no disputes pending in connection with the First Request and the Service's

response. *See* ECF 19 ("Opp'n Summ. J. Mem.") at 3–4.

On the same day, the Service also responded that it had found documents responsive to the

Second Request and that it would process and mail the responsive documents to NYT. Campbell

Decl., ¶ 18. On January 27, 2017, the Service produced the responsive documents. *Id.*, ¶ 19. The

produced documents provided the date of air travel, the departure and arrival locations, the total

cost per flight, and the total cost owed by the Service. *See, e.g., id.*, Ex. H at 4 ("Date"; "Leg of

Trip"; "Total Cost of Leg"; "Amount Owed"). Certain portions of the produced documents were

redacted, claiming FOIA Exemptions under 5 U.S.C. §§ 552(b)(4), (b)(6), (b)(7)(C), and (b)(7)(E). Redacted information included the total number of passengers, the total number of Secret Service passengers, the cost per passenger on each of the campaign flights, and the total cost on the Service for each of the campaign flights. *See, e.g., id.* ("Total Passengers to Include USSS"; "Total USSS Passengers"; "Cost Per Passenger"; "Total USSS Cost For Leg").

On February 2, 2017, NYT appealed the Service's January 27, 2017 decision to redact information based on 5 U.S.C. § 552(b)(7)(E) ("FOIA Exemption 7(E)"). Campbell Decl., ¶ 22. NYT contended that the Service could not invoke FOIA Exemption 7(E) "to avoid disclosing the number of Secret Service agents on any given flight" because "historical staffing data do not constitute a technique, procedure, or guideline within the meaning of Exemption 7(E) and that, to the extent they could be considered guidelines, their disclosure does not reasonably risk circumvention of law." *Id.*, Ex. K, at 2. While the NYT's appeal was pending before the Service, and before the Service responded to the Third and Fourth requests, on March 15, 2017, NYT filed its complaint, challenging (1) the redactions made pursuant to Exemption 7(E) in documents responsive to the Second Request; and (2) failure to produce documents responsive to Third and Fourth Requests. *See* ECF 1 ("Compl.") ¶¶ 50, 51.

On March 31, 2017, the Deputy Director of the Secret Service responded to the NYT's appeal, informing NYT that the redactions made pursuant to Exemption 7(E) were proper. Campbell Decl., ¶ 23. Specifically, he stated:

> "The records in question contain information compiled for law enforcement purposes. Pursuant to Title 5, United States Code, sections [sic] (b)(7)(E), this information continues to be withheld as information that could disclose techniques and procedures for law enforcement investigations or prosecutions and such disclosure could risk circumvention of the law."

*Id.*, Ex. L.

On April 25, 2017, the Service produced documents responsive to the Third Request. *Id.*, ¶ 20. As with documents responsive to the Second Request, these documents showed, for each flight, the date, the departure and arrival locations, and the total cost to the Service for each leg. *See, e.g., id.*, Ex. I at 5 ("Date"; "Leg of Trip"; "Total USSS Cost for Leg"). The documents excluded the total number of passengers, the total number of Secret Service passengers, total cost for each campaign flight, and the cost per passenger for each campaign flight. *See, e.g., id.* ("Total Passengers to include USSS"; "Total USSS Passengers"; "Total Cost of Leg"; "Cost Per Passenger"). The Service claimed that the redacted information need not be disclosed under 5 U.S.C. §§ 552(b)(4), (b)(6), (b)(7)(C), and (b)(7)(E). Campbell Decl., ¶ 20. On the same day, the Service also responded to the Fourth Request. *Id.*, ¶ 21. The Service again produced similar documents, and withheld information on the number of the Service's personnel who travelled on the chartered planes. *See, e.g., id.*, Ex. J at 6.

On July 6, 2017, the Service moved for summary judgment on the ground that it properly withheld the redacted information under FOIA Exemptions 7(E) and 7(F)[1]. *See* ECF 15 ("Summ. J. Mem.") at 4. On August 2, 2017, NYT cross-moved for summary judgment seeking an order directing the Service to produce responsive documents without redaction claimed pursuant to the FOIA Exemptions 7(E) and 7(F). *See* Opp'n Summ. J. Mem. at 7–8.

There are no disputes concerning whether the Service has conducted an appropriate search to identify responsive records; there are also no disputes concerning either party's good faith in

---

[1] When the Service produced responsive records, it did not claim that the redacted information is exempt from disclosure under Exemption 7(F). NYT does not object to the Service's position that it can retroactively claim Exemption 7(F) in this court proceeding. NYT is correct: the failure to claim Exemption 7(F) in its administrative process does not waive its right to claim the Exemption in a district court proceeding. *See Young v. C.I.A.*, 972 F.2d 536, 538 (4th Cir. 1992) ("[A]n agency does not waive FOIA Exemptions by not raising them during the administrative process").

seeking and withholding information. The sole dispute deals with the question whether FOIA

Exemptions 7(E) and 7(F) justify the redactions made by the Service; and objected to by NYT.

## DISCUSSION

**A.     Freedom of Information Act**

### (1) Purpose of Freedom of Information Act

In a government of the people, by the people, for the people, it is critical that citizens know

what their government is doing. If a government is to be held accountable, its citizens must be

well informed. To that end, the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 makes

government documents and records available to the public.

At the heart of FOIA is "a policy strongly favoring public disclosure of information in the

possession of federal agencies." *Halpern v. F.B.I.*, 181 F.3d 279, 286 (2d Cir. 1999). But the

public's right to know is not unlimited: FOIA exempts nine categories of records that would

otherwise be subject to disclosure (referred to as FOIA Exemptions). Exempt materials are not

subject to disclosure and may be kept in confidence. This framework "reach[es] a workable

balance between the right of the public to know and the need of the Government to keep

information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). "The

Exemptions are exclusive …, to be narrowly construed with doubts resolved in favor of

disclosure." *Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 508 (2d

Cir. 1992) (internal quotations and citations omitted). The Court reviews the agency's claimed

Exemptions *de novo*; and the agency bears the burden of persuasion. *U.S. Dep't of Justice v.

Reporters Comm. For Freedom of Press*, 489 U.S. 749, 755 (1989).

### (2) Standard of Review at Summary Judgment

FOIA cases are generally resolved on motions for summary judgment. *See Bloomberg L.P. v. Board of Governors of the Fed. Reserve Sys.*, 649 F.Supp.2d 262, 271 (S.D.N.Y. 2009). Summary judgment is available where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. § 56(a). Where the non-moving party has the burden of proof, however, the moving party need only show that there is no evidence to support a necessary element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

"In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an Exemption to the FOIA." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). The agency can satisfy this burden using "[a]ffidavits and declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an Exemption." *Id.*; *see also Halpern*, 181 F.3d at 287.

"Affidavits submitted by an agency are accorded a presumption of good faith." *Carney*, 19 F.3d at 812. But "[c]onclusory assertions of privilege will not suffice to carry the government's burden of proof in defending FOIA cases." *Assadi v. U.S. Citizenship & Immigration Servs.*, 2015 WL 1500254, at *5 (S.D.N.Y. Mar. 31, 2015) (Ellis, Mag. J.). "[T]he agency's decision that the information is exempt from disclosure receives no deference." *Bloomberg, L.P. v. Board of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010).

## B.     Motions for Summary Judgment

The Service moves for summary judgment on the ground that it properly withheld the redacted information under FOIA Exemptions 7(E) and 7(F), which shield from disclosure:

"records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual".

5 U.S.C. § 552 (b)(7)(E); (F).

NYT does not dispute that the responsive records and the redacted information are "compiled for law enforcement purposes." NYT is correct.

> The ordinary understanding of law enforcement includes not just the investigation and prosecution of offenses that have already been committed, but also proactive steps designed to prevent criminal activity and to maintain security. ... [A] law-enforcement agency is charged with the apprehension of alleged offenders *as well as crime detection and prevention.* ... Crime prevention and security measures are critical to effective law enforcement as we know it. There can be no doubt ... that the Secret Service acts with a law enforcement purpose when it protects federal officials from attack, even though no investigation may be ongoing.

*Milner v. Dep't of Navy*, 562 U.S. 562, 582–83 (2011) (Alito, J., concurring) (internal quotations omitted) (emphasis in original). It is thus clear that "law enforcement purposes" cannot be limited to investigation and prosecution of offenses. Accordingly, the sole issue here is whether the disclosure sought by NYT falls within Exemptions 7(E) and 7(F), as the Service contends; or is not covered by the Exemptions as NYT argues.

The Service has already produced its total campaign flight costs for each trip, for each candidate during the recent Presidential campaign; but redacted the costs paid per seat. The Service contends redacted information would reveal the number of Service agents who were providing protective services on the flights. Summ. J. Mem. at 11. This in turn would disclose protective techniques and procedures used by the Service. In other words, the sought after information would "enabl[e] adversaries to have advance notice of protective operational

measures" that the Service implements in similar situations, and adversaries may use such advance notice to harm the Service protectees and agents. The Service claims such information is protected from disclosure under FOIA Exemptions 7(E) and 7(F). *Id.* at 14–15.

NYT cross-moves for summary judgment seeking production of the Service's responsive documents, without redaction. *See* Opp'n Summ. J. Mem. at 7–8. NYT contends the Service has failed to adduce sufficient facts to meet its burden of persuasion under Exemptions 7(E) and 7(F); and in any event, the disclosure of staffing on 2016 campaign flights, specifically determined based on particular circumstances surrounding the 2016 Presidential election, are not predictive of flight staffing guidelines for the 2020 Presidential campaign nor flight staffing guidelines outside the campaign context. ECF 20 ("McCraw Decl."), ¶ 10. In other words, the number of agents on the 2016 campaign flights would not divulge anything about the staffing of protective details on future flights.

The Court holds that the Service has sufficiently established the applicability of Exemptions 7(E) and 7(F). The Service has submitted declarations by Robert P. Buster, the Assistant Director of the Office of Protective Operations for the United States Secret Service, illustrating, with sufficiently detailed explanations, how the disclosure of redacted information would enable adversaries to gather intelligence on the Service's protective means and methods and foresee the staffing of protective details on future flights. Such disclosure could reasonably be expected to risk circumvention of the law, as required under Exemption 7(E); or, alternatively, could reasonably be expected to endanger the life or physical safety of any individual, as required under Exemption 7(F). Accordingly, the Service has properly withheld redacted information under Exemption 7(E); or, alternatively, under Exemption 7(F). The Service's motion for summary judgment is GRANTED; and the NYT's cross-motion for summary judgment is DENIED.

### (1) The Service's Protective Mission

Under 18 U.S.C. § 3056, the Service is authorized to protect a number of specified individuals, including the President and the Vice President, as well as the President elect and Vice President elect. During the Presidential election cycle, every four years, the list of protectees expands to include major Presidential candidates and Vice Presidential candidates, and within 120 days of the general presidential election, the spouses of such candidates. *See* McCraw Decl., Ex. 4, at 2. Given its other protective assignments which continue from year to year, it is fair to say that the Service has a substantial increase in its protective workload every four years.

The protection the Service provides to "an individual is comprehensive and goes well beyond surrounding the individual with well-armed agents. As part of the Service's mission of preventing an incident before it occurs, the agency relies on meticulous advance work and threat assignments developed by its Intelligence Division to identify potential risks to its protectees." McCraw Decl., Ex. 12 (Service's description of its protective work). The Service enhances its protective operations by integrating into them a variety of technologies. McCraw Decl., Ex. 11, at 9. The Service also maintains specialized resources to further optimize the capability of the protective details, including "the Airspace Security Branch, the Counter Sniper Team, the Emergency Response Team, the Counter Surveillance Unit, the Counter Assault Team, the Hazardous Agent Mitigation and Medical Emergency Response Team and the Magnetometer Operations Unit." *Id.*, at 9–10. The Service has additional resources to protect against "chemical, biological, radiological and nuclear materials and explosive devices." *Id.*

### i. High Demand for Protection

The demand for the Service's protection is high. In addition to protecting the President, Vice President and their families, the Service also protects all former Presidents and their spouses

for life, as well as any children under the age of 16; the Secretary of the Treasury, Secretary of Homeland Security, Deputy Secretary of Homeland Security, the White House Chief of Staff, National Security Advisor, and other government officials; all visiting foreign heads of state and government and their spouses; and distinguished visitors, for example a papal visit. McCraw Decl., Ex. 11, at 9.

As previously indicated, during the Presidential election cycle, the Service takes on the added responsibilities of providing protection to several presidential and vice presidential nominees and their families. The demand for the Service's protection was particularly high during the 2016 Presidential campaign, which proved to be long, with numerous candidates, visiting many cities, with large campaign venues. The Service met such protective responsibilities by having its agents work overtime and redeploying its agent from other investigative and enforcement work to the Service's protective work.

### ii. Service's Candidate Nominee Operation Section

The Service has a dedicated group called Candidate Nominee Operation Section (CNOS) that trains and assigns special agents for the protection of Presidential candidates. McCraw Decl., Ex. 14, at 5.

> The CNOS protective details are comprised of special agents from our 142 domestic field offices. The CNOS details operate on 21 day rotational assignments. Upon completing their protective rotation, they return to their respective office and continue their criminal investigative cases or participate in protection assignments in their district. Agents assigned to a candidate protective detail continue on this protection rotation through the end of the campaign or until the candidate they are assigned to protect withdraws from the campaign.

*Id.*

In preparation for the 2012 Presidential campaign, CNOS began the training of protective details in May 2011, with the goal of completing the training by August 2011 and be assigned to provide protection for a Presidential candidate. *Id.*

### iii. Challenges with Service's Protective Mission

The Service is not without its difficulties, many of which can be attributed to underfunding; government shutdowns; and the reliance on continuing resolutions to provide (or not provide) essential funding. McCraw Decl., Ex. 1, at 2, 126, 128. Law enforcement is not a 9-to-5, Monday through Friday occupation; the work that federal law enforcement offices perform does not lend itself to regular schedules. The Service is no exception, and given its "zero failure" goal and the dual mission of investigation of crimes and protection of officials, the Service might be tasked with one of the most challenging jobs. McCraw Decl., Ex. 9, at 1. While most investigations can be managed and controlled, the protective schedules and events are usually driven by current events in the nation and the world. With the exception of the government officials, the Service is tasked to protect, on a regular basis, a number of individuals that cannot be anticipated or planned for in advance. During a Presidential campaign year, with numerous and often last minute campaign stops, multiple primary and general election debates, and the national conventions, the Service is always forced to "react and handle" rather than "plan and execute" its mission. This presents an unusual situation for the Service when it comes to effectively planning its yearly budget request, which leads to chronic underfunding, which in turn leads to various difficulties such as understaffing; high attrition rates; low morale; and reliance on outdated equipment and technology.[2]

Notwithstanding these difficulties, there is no suggestion in any of the materials attached to the McCraw declaration that the Service is not meeting its goal of providing adequate protection. The attached materials suggest that the goal is difficult to achieve. But the attached materials

---

[2] One of the mechanisms the Service implements to meet its protective goals is overtime, but the amount of overtime that can be paid is limited by Federal personnel policy. This results in agents working overtime, but not being paid for the work. This contributes to attrition and low morale.

nonetheless indicate that the Service achieves its goal, by providing overtime for the Service's agents, redeploying the agents, and cutting back on other facets of the Service's agenda such as investigative operations.

### (2) Buster's *Ex Parte* Declaration

In support of its motion, the Service submits three declarations by Robert P. Buster. Two of the declarations are public, and the third is submitted *ex parte* for *in camera* review. *See* ECF 25 (Notice of Lodging of *Ex Parte In Camera* Declaration).

Courts are authorized to review, *in camera*, (1) information withheld pursuant to a FOIA Exemption, 5 U.S.C. § 552(a)(4)(B), and (2) classified declarations when national security is at issue, *Am. Civil Liberties Union v. Office of the Dir. of Nat'l Intelligence*, 2011 WL 5563520, at *12 (S.D.N.Y. Nov. 15, 2011). But reviewing *ex parte* declarations, *in camera*, is not favored. "A court should only consider information *ex parte* and *in camera* that the agency is unable to make public if questions remain after the relevant issues have been identified by the agency's public affidavits and have been tested by plaintiffs." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 75 (2d Cir. 2009).

The *in camera* review of Buster's *ex parte* declaration is necessary here. Buster's public declarations provide reasonably detailed explanations for claiming the FOIA Exemptions. *See infra* § B(3)(i) at 14 ("The Service has established that disclosure of redacted information "would disclose [law enforcement] guidelines."). Nonetheless, NYT contends that Buster's public declarations are conclusory, *see* Opp'n Summ. J. Mem. 9–10; and accordingly the Court should give them no weight. *See Halpern*, 181 F.3d at 290 (declarations in support of a FOIA Exemption "must include a relatively detailed analysis of the withheld material in manageable segments without resort to conclusory and generalized allegations of Exemptions."). To the extent some

statements may be deemed conclusory, the Court may review his *ex parte* declaration *in camera* to determine whether any deficiencies can be cured. Accordingly, the Court considers Buster's *ex parte* declaration *in camera*.[3]

In keeping with the procedure implemented in *New York Times v. U.S. Department of Justice*, this opinion analyzes only the public declarations. 915 F. Supp. 2d 508, 516 (S.D.N.Y. 2013). The analysis of the *in camera* declaration is provided in an appendix to this opinion, which is filed under seal in the U.S. District Court for the Southern District of New York and is made available only to the United States Secret Service and the Federal Judiciary.

### (3) FOIA Exemption 7(E)

The Service claims it has properly redacted portions of responsive documents pursuant to FOIA Exemption 7(E), which shields from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or *would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law*." 5 U.S.C. § 552 (b)(7)(E) (emphasis added). The Service claims the redactions are proper under the "guidelines" clause, quoted above. Summ. J. Mem. at 11–15.

NYT urges, however, that the Service has not met its burden to establish that: (1) the redacted information "would disclose [law enforcement] guidelines"; and (2) such disclosure "could reasonably be expected to risk circumvention of the law." Opp'n Summ. J. Mem. at 8–17.

The Court holds that the Service has properly claimed Exemption 7(E) to shield redacted information from disclosure. Buster's declarations, for reasons discussed below, provide

---

[3] NYT does not object to this procedure for the *in camera* review of the *ex parte* declaration. *See* ECF 21 at 1.

"reasonably detailed explanations why any withheld [information] fall[s] within [Exemption 7(E)]." *Carney*, 19 F.3d at 812.

      i.  <u>The Service has established that disclosure of redacted information "would disclose [law enforcement] guidelines."</u>

In the context of Exemption 7(E), "guidelines" refer to "an indication or outline of future policy or conduct" that implicates "resource allocation." *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010) ("Lowenstein"). The "guidelines" provide guidance for *future* conduct. Guidelines cannot merely be a recitation of something that has already happened.

Many of the documents submitted with the McCraw declaration make clear that the disclosure of agent staffing on 2016 campaign flights would reveal information about the Service's future flight operations. According to these documents, the Service initiates planning of protections for candidates in a Presidential campaign by first analyzing prior Presidential campaigns; in order to plan for what may happen in the future (*e.g.*, number of candidates; frequency of travel; threat levels), the Service finds it helpful to learn what had occurred in past campaigns. *See, e.g.,* McCraw Decl., Ex. 14. These documents thus suggest that the disclosure of information about protective operations in 2016 would lead to dissemination of information about future flight operations. That is a guideline for future conduct.

Buster's declarations provide further support. According to Buster, the Service redacted parts of the responsive documents to prevent disclosure of the number of Secret Service personnel that flew with the 2016 presidential candidates on campaign flights. ECF 16 ("Buster Decl."), ¶ 5. Such staffing information "would clearly show the manpower present to conduct direct protection in such situations," and the manpower information could "enabl[e] adversaries to have

advance notice of protective operational measures in place in a particular situation."[4]  *Id.*  In particular, adversaries could "extrapolate [the 2016 staffing information to obtain] the number of Secret Service personnel on the flights of other protectees," which could be "combined with others to better understand our protective methods" and "harm" the protectees and agents.  ECF 24 ("Buster Supp. Decl."), ¶ 4.

Buster's explanations are persuasive and sufficiently detailed.  Without the redacted information, a person may only guess at how many Service agents are assigned for in-flight protection.  The redacted information, when extrapolated, enable a person to predict the number of agents assigned to protective details in similar flight operations, and hence, the Service's protective means and methods.  These protective means and methods are not merely a recitation of what has already happened; they provide guidance on the Service's future operations.  They are exactly the type of "guidelines" on resource allocation that Exemption 7(E) is designed to protect.

At the very least, there is no doubt that the redacted information would expose a portion of the Service's protective means and methods used under similar circumstances.  After all, the number of agents assigned to protective details *is* one part of the Service's protective operational means and methods.  It may not reveal the protective methods in their entirety.  But Exemption 7(E) does not require that.  As long as withheld information would reveal an aspect of a resource allocation scheme, as the Service has sufficiently established here, Exemption 7(E) applies.

NYT paints the staffing of agents on 2016 campaign flights as an anomaly due, in part, to the understaffing at the Service, and suggests that it cannot forecast what would happen in the next Presidential campaign in 2020.  *See* Opp'n Summ. J. Mem. at 11–12.  The Court disagrees.  The sought after disclosure would in fact effect more than the next Presidential campaign; disclosure

---

[4] It must be noted that the protective detail on flight is armed.  Thus, the disclosure of the number of agents on flight would reveal information on protective operational measures (*e.g.*, fire power) on flight.

of the staffing levels in 2016 would yield information on *all* future flights by those protected

pursuant to the Service's mandate, not just future Presidential campaign flights. While the Service

as a whole may have been understaffed, the individual protective operation on 2016 campaign

flights was not, as Buster states. *See* ECF 24 ("Buster Supp. Decl."), ¶ 2 ("The number of Secret

Service personnel onboard the airplane flights of protectees during the 2016 presidential campaign

was not reduced or affected by staffing constraints"). The Service maintained adequate protective

staffing by allowing for overtime work; rotating more agents from field offices and giving a

preference to the Service's protective missions at the expense of its investigation and enforcement

responsibilities in, for example, counterfeiting, cybercrimes. *See* McCraw Decl., Ex. 13 at 6

(reallocation of funding from investigative activities to presidential campaign related work); Ex.

14, at 7, 8.

Accordingly, the Service has sufficiently established that the production of redacted

information "would disclose [law enforcement] guidelines."

> ii. The Service has established that the disclosure of redacted information "could
>
> reasonably be expected to risk circumvention of the law."

Exemption 7(E) further requires the Service to establish that the disclosure "could

reasonably be expected to risk circumvention of the law." NYT appears to agree that if an

adversary had advanced notice of the manpower present for protective services, an adversary could

leverage that information to circumvent the law. *See* Opp'n Summ. J. Mem. at 15. NYT contends,

however, that disclosure of staffing on 2016 campaign flights cannot give such advance notice.

*Id.*

The Court determines that the risk of circumvention of the law has been established. As

the Court observed above, the number of agents assigned to a 2016 campaign flight would enable

an adversary to estimate the number of agents that would be staffed on future flights. *See supra* §

B(3)(i) at 14. That estimate could provide "advance notice of the protective operational measures"

implemented under similar circumstances, and "[w]ith that information, adversaries could more

easily plan, disable, or circumvent the Secret Service protective techniques." ECF 16 ("Buster

Decl."), ¶5. That estimate could also "nullify the current and future effectiveness of the Secret

Service's onboard protective personnel measures and render these measures operationally

deficient." *Id.* The disclosure of 2016 staffing information therefore "could reasonably expected

to risk circumvention of the law."

The Service has established both requirements of FOIA Exemption 7(E). Accordingly, the

Service is entitled to withhold the redacted information under FOIA Exemption 7(E).

### (4) FOIA Exemption 7(F)

The Service also claims it has properly redacted pursuant to FOIA Exemption 7(F), which

shields from disclosure "records or information compiled for law enforcement purposes, but only

to the extent that the production of such law enforcement records or information . . . (F) could

reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552

(b)(7)(F).

NYT contends the Service has not established that Exemption 7(F) is applicable. NYT

argues that the Service has failed to: (1) identify a reasonably specific group of individuals as "any

individual" to whom the disclosure of withheld information is dangerous, Opp'n Summ. J. Mem.

at 18–21; and (2) carry its burden to demonstrate that disclosure of historical staffing information

could reasonably be expected to endanger the identified group, *id.* at 21–23.

The Court disagrees. For the reasons set forth below, the Court holds that the Service's redaction is appropriate under FOIA Exemption 7(F) because disclosure of redacted information could reasonably be expected to endanger the Service protectees and agents.

### i. The Service has identified, with reasonable specificity, the group of individuals that would be endangered by disclosure of redacted information.

The Service claims Exemption 7(F) applies here because release of redacted information could reasonably be expected to endanger "present and future Secret Service protectees, as well as the agents assigned to their details." Summ. J. Mem. at 15. NYT contends that the Service improperly invokes Exemption 7(F) "on the basis of an alleged danger posed to too general a set of people." Opp'n Summ. J. Mem. at 18.

The operative question here is whether the Service has identified "any individual," as required by Exemption 7(F), with "reasonable specificity." *Am. Civil Liberties Union v. Dep't of Def.*, 543 F.3d 59, 71 (2d Cir. 2008), *judgment vacated on other grounds*, 558 U.S. 1042 (2009) ("ACLU"). In *ACLU*, the Second Circuit held that Exemption 7(F) is not available to prevent disclosure of certain photographs simply because the disclosure could incite violence against "United States troops, other Coalition forces, and civilians in Iraq and Afghanistan." *Id.* at 67. The Second Circuit emphasized that "any individual" need not refer to "known, named individuals," *id.* at 81, but it cannot refer to "individuals identified solely as members of a group so large that risks which are clearly speculative for any particular individuals become reasonably foreseeable for the group," *id.* at 67. "The phrase 'any individual' in Exemption 7(F) may be flexible, but is not vacuous." *Id.* "[I]n order to justify withholding documents under Exemption 7(F), an agency must identify *at least one individual with reasonable specificity* and establish that

disclosure of the documents could reasonably be expected to endanger that individual." *Id.* at 71 (emphasis added).

But that reasonable specificity does not go so far as to require names, rank, and serial numbers before Exemption 7(F) would be applicable. Rather:

> "If disclosure of law enforcement records concerning the Cali cartel could reasonably be expected to endanger the lives of an informant's (or a witness's) extended family in Colombia, Exemption 7(F) applies. Similarly, the disclosure of the identity of a person providing information about Sicilian drug trafficking might reasonably be expected to endanger that person's relatives and associates in Palermo. In those circumstances, the government need not even know, let alone name, all of those persons before it may properly invoke Exemption 7(F) to protect them."

*Id.* at 81.

Here, the Service identifies, as "any individual," the protectees authorized to be protected by statute (18 U.S.C. § 3056) and Secret Service agents assigned to their protective details (hereinafter referred to as the Identified Group). The Court holds that the Identified Group is reasonably specific. The Identified Group, specified by statute, is identified by title and function whom the Service is authorized to protect. The Identified Group is limited to a small number of individuals who, at any given point, in fact can be identified by name: the President and Vice President of the United States and their immediate families; former Presidents of the United States and their spouses; major presidential and Vice presidential candidates; foreign heads of state visiting in the United States; and other high-level governmental officials as designated by statute or by the President. ECF 16 ("Buster Decl."), ¶ 2; 18 U.S.C. § 3056A(a). The size of Service agents assigned as protective details is also correspondingly small, substantially smaller than "a group composed of millions of people" in *ACLU*. 543 F.3d at 67.

The Identified Group is also, in one respect, more specific than the groups that *ACLU* finds to be reasonably specific. *ACLU* indicates that even a group of people identified *indirectly*, on the

basis of their relationship to another person, is sufficiently specific. *See supra*; 543 F.3d at 81.
Here, the statute *directly* identifies a specific group of people. This group is more than reasonably
specific.

### ii. The Service has established that disclosure of redacted information could reasonably be expected to endanger the Identified Group.

Next, the Service must establish that disclosure of the redacted information could
reasonably be expected to endanger the Identified Group. *ACLU*, 543 F.3d at 71. The analysis
here is the same as it was under Exemption 7(E), and the result is the same.

The Service's burden under Exemption 7(F) is a low one. Exemption 7(F) is applicable
when disclosure of information "*could reasonably be expected* to endanger the life or physical
safety of" the Identified Group. 5 U.S.C. § 552 (b)(7) (emphasis added). Exemption 7(F) was
amended in 1986—inserting "could reasonably be expected to" for "would"—to "ma[ke] it easier
for the government to demonstrate facts necessary to satisfy [it]." *ACLU*, 543 F.3d at 78–79; *see
also* 5 U.S.C. § 552 (b)(7) (1986); *Milner*, 562 U.S. at 582 ("In most cases involving security
information, it is not difficult to show that disclosure may 'endanger the life or physical safety of
any individual.'") (Alito, J., concurring).

The Service has demonstrated sufficient facts to establish that the disclosure could
reasonably be expected to endanger the Identified Group. As discussed above with respect to
Exemption 7(E), *see supra* § B(3)(ii) at 16 ("The Service has established that the disclosure of
redacted information could reasonably be expected to risk circumvention of the law"), if
manpower information is made available to the public, then any adversary could use that
information to estimate the manpower deployed on similar future flights. That estimate could
provide "advance notice of the protective operational measures" implemented under similar

circumstances, and "[w]ith that information, adversaries could more easily plan, disable, or circumvent the Secret Service protective techniques." ECF 16 ("Buster Decl."), ¶ 5. That estimate could also "nullify the current and future effectiveness of the Secret Service's onboard protective personnel measures and render these measures operationally deficient." *Id.* The disclosure of 2016 staffing information therefore "could reasonably expected to endanger" the Identified Group.

This risk of danger is reasonably specific to the Identified Group, in contrast to the risk identified in *ACLU*. There, the risk of attack on any one member of the specified group—United States troops, other Coalition forces, and civilians in Iraq and Afghanistan—was "diffuse and speculative" in part because the members were generally not high priority targets. *ACLU*, 543 F.3d at 71. Here, Secret Service protectees are high priority targets of organizations and foreign powers, as well as terrorist organizations. *See* McCraw Decl., Ex. 14, at 3 ("[O]ur protectees remain a highly sought after target by terrorist organizations."). That is precisely why they are protected by statutes. And, since the Service agents protect high priority targets, they themselves understandably are involved as high priority targets. Accordingly, the risk of danger in any one member of the Identified Group is substantially more specific and palpable here than in *ACLU*.

Accordingly, the Court finds that the Service has identified "any individual" with reasonable specificity; and established that the disclosure of redacted information could reasonably be expected to endanger the Identified Group. *ACLU*, 543 F.3d at 71. Since the Service has establish both requirements of Exemption 7(F), the Court holds that the Service's redaction is proper under Exemption 7(F).

For reasons provided above, the Service has properly redacted information from the responsive documents under FOIA Exemption 7(E); or, alternatively, under FOIA Exemption

7(F). Accordingly, the Service's motion for summary judgment is GRANTED; and the NYT's cross-motion for summary judgment is DENIED.

**C.     Monetary Relief Under 5 U.S.C. § 552(a)(4)(E)**

NYT requests the Court to award "reasonable attorney fees and other litigation costs" pursuant to 5 U.S.C. § 552(a)(4)(E). *See* ECF 18. The request is DENIED.

FOIA expressly permits the Court to "assess against the United States reasonable attorney fees and other litigation costs reasonably incurred" by a plaintiff if the plaintiff "has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). A plaintiff is deemed to "ha[ve] substantially prevailed if [the plaintiff has] obtained relief through … a judicial order." 5 U.S.C. § 552(a)(4)(E)(ii)(I).

Here, NYT has not substantially prevailed because NYT has failed to obtain any relief. Accordingly, NYT cannot recover the fees and costs under 5 U.S.C. § 552(a)(4)(E)(i). The NYT's request is accordingly DENIED.

**CONCLUSION**

For the reasons provided above, the Service's motion for summary judgment is GRANTED; NYT's cross-motion for summary judgment is DENIED; and NYT's request for attorneys' fees and costs is DENIED.

The Clerk of the Court is directed to close all pending motions and terminate the action.

Dated:  New York, New York
       February 1, 2018

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge